# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OMAR DEGHAYES,<br>    Detainee, Camp Delta; | ) <br> ) <br> ) |
| Taher Desghayes,<br>    as Next Friend of Omar Deghayes; | ) <br> ) <br> ) |
| JAMEL ABDULLAH KIYEMBA,<br>    Detainee, Camp Delta; | ) <br> ) <br> ) |
| Theresa Namuddu,<br>    as Next Friend of Jamel Kiyemba; | ) <br> ) <br> ) |
| SHAKER ABDURRAHEEM AAMER,<br>    Detainee, Camp Delta; | ) <br> ) <br> ) |
| Saeed Ahmed Siddique,<br>    as Next Friend of Shaker Abdurraheem<br>    Aamer; | ) <br> ) <br> ) |
|     Petitioners, | ) |
| v. | ) |
| GEORGE WALKER BUSH,<br>    President of the United States<br>    The White House<br>    1600 Pennsylvania Ave., N.W.<br>    Washington, D.C. 20500 | ) <br> ) <br> ) <br> ) <br> ) |
| DONALD RUMSFELD,<br>    Secretary, United States<br>    Department of Defense<br>    1000 Defense Pentagon<br>    Washington, D.C. 20301-1000 | ) <br> ) <br> ) <br> ) <br> ) |
| ARMY BRIG. GEN. JAY HOOD,<br>    Commander, Joint Task Force - GTMO<br>    Guantánamo Bay Naval Station<br>    Guantánamo Bay, Cuba | ) <br> ) <br> ) <br> ) |
| ARMY COL. NELSON J. CANNON,<br>    Commander, Camp Delta,<br>    Guantánamo Bay Naval Station<br>    Guantánamo Bay, Cuba | ) <br> ) <br> ) <br> ) |

FILED

DEC 2 2 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CASE NUMBER   1:04CV02215

JUDGE: Rosemary M. Collyer

DECK TYPE: Habeas Corpus/2255

DATE STAMP: 12/22/2004

JURY ACTION

|  |  |
|---|---|
| **Respondents** | ) |
|  | ) |
|  | ) |
| **All sued in their official capacities.** | ) |
|  | ) |

## PETITION FOR WRIT OF HABEAS CORPUS

1. Petitioners Omar Deghayes, Jamel Abdullah Kiyemba and Shaker Abdurraheem Aamer seek the Great Writ. They act on their own behalf or through a Next Friend. They are being held virtually *incommunicado* in Respondents' unlawful custody.

### JURISDICTION

2. Petitioners bring this action under 28 U.S.C. §§2241 and 2242, and invoke this Court's jurisdiction under 28 U.S.C. §§1331, 1651, 2201, and 2202; 5 U.S.C. §702; as well as the Fifth, Sixth, and Eighth Amendments to the United States Constitution, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, and customary international law. Because they seek declaratory relief, Petitioners also rely on F. R. Civ. P. 57.

3. This Court is empowered under 28 U.S.C. §2241 to grant the Writ of Habeas Corpus, and to entertain the Petition insofar as it is filed by Next Friends, under 28 U.S.C. §2242. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. §2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. §2202, as this case involves an actual controversy within the Court's jurisdiction.

### II
### VENUE

4. Venue is proper in the United States District Court for the District of Columbia, since at least one respondent resides in the district, a substantial part of the events or omissions giving rise to the claim occurred in the district, at least one respondent may be found in the district, and all

respondents are either officers or employees of the United States or any agency thereof acting in their official capacities. 28 U.S.C. §§ 1391(b); 1391(e).

# III
# PARTIES

5. Petitioner Omar Deghayes is a Libyan citizen who has been a long-term British resident, and is currently incarcerated and held in respondents' unlawful custody in Camp Delta, Guantánamo.

6. Petitioner Taher Deghayes is Omar's brother. Because Omar cannot secure access either to legal counsel or the courts of the United States, Taher acts as Next Friend.

7. Petitioner Jamel Abdullah Kiyemba is a Ugandan citizen who has been a long-term British resident since he was approximately fourteen years old, and is currently incarcerated and held in respondents' unlawful custody in Camp Delta, Guantánamo.

8. Petitioner Theresa Namuddu is Jamel's mother. Because Jamel cannot secure access either to legal counsel or the courts of the United States, Theresa Namuddu acts as Next Friend.

9. Petitioner Shaker Abdurraheem Aamer is a Saudi citizen who has been a long-term British resident, and is currently incarcerated and held in respondents' unlawful custody in Camp Delta, Guantánamo.

10. Petitioner Saeed Ahmed Siddique is Shaker's father-in-law. Because Shaker cannot secure access either to legal counsel or the courts of the United States, Saeed Siddique acts as Next Friend.

11. Respondent Bush is the President of the United States and Commander in Chief of the United States Military. Respondent Bush is ultimately responsible for Petitioners' unlawful detention. He is sued in his official capacity.

12. Respondent Rumsfeld is the Secretary of the United States Department of Defense. Pursuant to either the November 13, 2001 Military Order or the President's authority as Commander in Chief and under the laws and usages of war, Respondent Rumsfeld has been charged with maintaining the custody and control of the detained Petitioners. He is sued in his official capacity.

13. Respondent Hood is the Commander of Joint Task Force-GTMO, the task force running the detention operation at Guantánamo. He has supervisory responsibility for the detained Petitioners and is sued in his official capacity.

14. Respondent Cannon is the Commander of Camp Delta, the U.S. facility where the detained Petitioners are presently held. He is the immediate custodian responsible for their detention, and is sued in his official capacity.

## IV
## STATEMENT OF FACTS

15. The detained Petitioners are not, nor have they ever been, enemy aliens, lawful or unlawful belligerents, or combatants of any kind.

### Petitioner Omar Deghayes

16. Petitioner Omar Deghayes ("Omar") is a Libyan national who is a British resident, and who is in Respondents' unlawful custody.

17. Omar's mother is Zohra, who is a housewife. Omar is the third of five children. All of the children except for Omar are British citizens.

18. Omar's father was Amer, and he was a lawyer in Libya. He was politically active as a democrat before Colonel Gadaffi took power in 1969. Indeed, when Gadaffi came to power, Gadaffi tried to win Amer over by offering him various places in the government, including the post of foreign minister, because Amer was a leading intellectual in the country. Amer turned him down because Gadaffi's regime was not a democracy, and from that day, the government viewed him as an opponent of the regime.

19. This was in 1969. As Gadaffi's government became more unpopular, they pressed Amer to join the government again ten years later, and he again refused. In 1980, one Sunday a government official came to the house when the children were having a poetry lesson. Amer had to leave with the official and the children never saw him again. The following Wednesday, another official called an uncle in the family and said Amer had died in prison. His funeral was the first major demonstration against the Gaddafi regime in the streets of Libya, when many people were arrested for opposing the government.

20. When Omar was four years old, his older brother Taher was playing swords with another kid, and the kid accidentally hit Omar's eye and damaged his retina. The doctors in Libya wanted to take it out, but Omar's father was devastated, and managed to have him go to Switzerland. Omar was there for about two years and had several operations. Despite all of this, his sight in that eye was not saved, and he is partly blind in one eye.

21. Omar had problems with his eyes, and he used to go to Switzerland every year to have check-ups. When Omar spent two years in Switzerland, his Swiss surgeon and her children took him in. He practically became another son to her. This relationship has always continued.

22. The whole family managed to escape Libya in 1986 when the family got a visa to go on one of the trips to Switzerland. The family did not return to Libya, but went to England and applied successfully for political asylum. The family went to England because their father used to send them to England for summer school every year to learn the language.

23. Omar is still a citizen of Libya. He was born on November 15, 1969. He is the only one who has never taken out British nationality. He wanted one day to go back to Libya. He wanted to follow in their father's footsteps, and help bring democracy to Libya.

24. Omar was strongly opposed to Colonel Gadaffi, because Gaddafi killed his father when Omar was very young, without any reason. Omar wrote an essay following his father's assassination that condemned the Libyan regime and its violations of human rights. One of his teachers forwarded the essay to the secret police. They wanted to arrest him and it was only because his mother and his head mistress pled that he was only ten or eleven that stopped them from taking him away and imprisoning him.

25. Omar is a great reader. He loves to read a great deal of history. He read and admired the works of Gandhi. He also enjoyed reading many biographies of political leaders like Nelson Mandela. He also liked poetry.

26. Omar also liked sports, including swimming and football. Because the family lived in England, he supported Manchester United. He would enjoy going to the fruit market in Brighton early in the morning. He would go camping with his younger brother in Scotland.

27. He took A levels (which are the English higher exams). He did well and was able to get into

law school. He was very interested in international law, with a focus on human rights law. He finished his law degree in London.

28. Official people in England respected him for his attitude towards religion – when people in a nearby prison in Sussex wanted to learn about their faith, the prison warden asked him to come and teach them about their faith.

29. After finishing his legal practice course, he decided to travel to the East and the Far East. He planned to do this for a while before returning to the UK. He was excited about the prospects of his trip.

30. He called our mother in 2000 to tell her that he was getting married. He married a girl from Afghanistan. Her name is Miriam.

31. Just before the Afghanistan war began, Omar took his family out of the country because he was afraid for them. They all went to Pakistan, where he was to apply for a visa for Mariam to come back with him to the UK. He called the family from Pakistan and said the family was fine there.

32. They were in Pakistan for a while before some people broke into their house because he was an Arab. There were bounties at the time for seizing "foreign Taliban" and apparently they sold him to the Americans as that. Miriam saw him being dragged away – the bounty hunters took all his money, and all of the things they owned. The local people made her leave and go back to Afghanistan.

33. Life for Miriam in Afghanistan was very difficult. Her father was the victim of harassment because Miriam was married to an Arab. In the end, she got in touch with Taher, WHO managed to send her money to get her out of there.

34. Omar and Miriam have a son Suleiman who is almost three years old. Omar has not seen his own child since Suleiman was very young. He has not seen a picture of Suleiman all that time.

35. Omar was taken to Kandehar and from there to Bagram Airforce base. Eventually, he was taken to Guantanamo Bay.

36. Omar asked for a Koran translation book, which his mother sent, but they sent it back without delivering it to him. Such letters as have got through have been heavily censored. Omar has

expressed great concern for his wife and son, and asked his family to take whatever steps possible to find them and help them.

37. This whole experience has been devastating for the family, particularly Omar's mother. First she lost her husband to Gadaffi, we ran away from him, and now she has lost her closest son, Omar. This has affected her health in a very bad way – her blood pressure has been up, she has been constantly worried because she does not know what is happening to him.

38. Petitioner Deghayes is not, and never has been, a member of Al Qaida or any other terrorist group. Prior to his detention, he did not commit any violent act against any American person or espouse any violent act against any American person or property. Nor was he involved in the ensuing armed conflict. He had no involvement, direct or indirect, in either the terrorist attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to Al Qaida or any terrorist group. He is not properly subject to the detention Order issued by the President. As he did not participate in the armed conflict at any point in time, he is not properly subject to the Executives's authority as Commander in Chief and under the laws and usages of war.

39. On information and belief, Petitioner Deghayes has had no military or terrorist training. He at no time voluntarily joined any terrorist force.

40. On information and belief, Petitioner Deghayes was not initially taken into custody by American forces. He was taken into custody against his will and handed over to the Americans. There is no credible evidence that he had engaged in combat against American forces.

41. On information and belief, Petitioner Deghayes promptly identified himself by his correct name and nationality to the United States. He requested that the United States provide him with access to his family and to legal counsel. He was kept blindfolded against his will for lengthy periods while being taken involuntarily to Guantánamo.

42. On information and belief, Petitioner Deghayes has been forced to provide involuntary statements to Respondents' agents both prior to and after his arrival at Guantánamo. Petitioner Deghayes has been terribly abused and tortured by Respondents' agents.

43. Petitioner Deghayes has been held under conditions that violate his international and constitutional rights to dignity and freedom from cruel, unusual and degrading treatment or punishment. He has been housed throughout his detention in accommodation that fails to satisfy both domestic and internationally accepted standards of accommodation for any person subject to detention. He has been refused meaningful access to their families. He has not been provided with the opportunity fully to exercise his religious beliefs. He has been exposed to the indignity and humiliation of the cameras of the national and international press, brought to Guantánamo with the express consent and control of Respondents.

### Petitioner Jamel Abdullah Kiyemba

44. Petitioner Jamel Abdullah Kiyemba ("Jamel") is a Ugandan national who is a British resident, and who is in Respondents' unlawful custody.

45. Jamel was born on April 22, 1979. He came to the U.K. around 1993, when he was about 14. He has been a resident of the U.K. ever since.

46. Jamel's mother, Theresa, works as a hairdresser, on a modest salary raising two children. She has no resources for the defense of her son.

47. Jamel had been studying at Leicester University, living with his aunt. At Christmas 2000, he became ill and his mother took him to see a psychiatrist. At one point he collapsed and had to be taken to hospital in an ambulance.

48. Petitioner Kiyemba is not, and never has been, a member of Al Qaida or any other terrorist group. Prior to his detention, he did not commit any violent act against any American person or espouse any violent act against any American person or property. Nor was he involved in the ensuing armed conflict. He had no involvement, direct or indirect, in either the terrorist attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to Al Qaida or any terrorist group. He is not properly subject to the detention Order issued by the President. As he did not participate in the armed conflict at any point in time, he is not properly subject to the Executives's authority as Commander in Chief and under the laws and usages of war.

49. On information and belief, Petitioner Kiyemba has had no military or terrorist training. He at

no time voluntarily joined any terrorist force.

50. On information and belief, Petitioner Kiyemba was not initially taken into custody by American forces. He was taken into custody against his will and handed over to the Americans. There is no credible evidence that he had engaged in combat against American forces.

51. On information and belief, Petitioner Kiyemba promptly identified himself by his correct name and nationality to the United States. He requested that the United States provide him with access to his family and to legal counsel. He was kept blindfolded against his will for lengthy periods while being taken involuntarily to Guantánamo.

52. On information and belief, Petitioner Kiyemba has been forced to provide involuntary statements to Respondents' agents both prior to and after his arrival at Guantánamo. Petitioner has been terribly abused and tortured by Respondents' agents.

53. Petitioner Kiyemba has been held under conditions that violate his international and constitutional rights to dignity and freedom from cruel, unusual and degrading treatment or punishment. He has been housed throughout his detention in accommodation that fails to satisfy both domestic and internationally accepted standards of accommodation for any person subject to detention. He has been refused meaningful access to their families. He has not been provided with the opportunity fully to exercise his religious beliefs. He has been exposed to the indignity and humiliation of the cameras of the national and international press, brought to Guantánamo with the express consent and control of Respondents.

### Petitioner Shaker Abdurraheem Aamer

54. Petitioner Shaker Abdurraheem Aamer ("Petitioner Aamer") is a Saudi national who is a British resident with indefinite leave to remain in the country, and who is in Respondents' unlawful custody.

55. Petitioner Aamer has four children, one of whom he has never seen. His wife Zinnira has been left to fend for them while he has been illegally detained for three years by Respondents.

56. Petitioner Aamer is not, and never has been, a member of Al Qaida or any other terrorist group. Prior to his detention, he did not commit any violent act against any American person or

espouse any violent act against any American person or property. Nor was he involved in the ensuing armed conflict. He had no involvement, direct or indirect, in either the terrorist attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to Al Qaida or any terrorist group. He is not properly subject to the detention Order issued by the President. As he did not participate in the armed conflict at any point in time, he is not properly subject to the Executives's authority as Commander in Chief and under the laws and usages of war.

57. On information and belief, Petitioner Aamer has had no military or terrorist training. He at no time voluntarily joined any terrorist force.

58. On information and belief, Petitioner Aamer was not initially taken into custody by American forces. He was taken into custody against his will and handed over to the Americans. There is no credible evidence that he had engaged in combat against American forces.

59. On information and belief, Petitioner Aamer promptly identified himself by his correct name and nationality to the United States. He requested that the United States provide him with access to his family and to legal counsel. He was kept blindfolded against his will for lengthy periods while being taken involuntarily to Guantánamo.

60. On information and belief, Petitioner Aamer has been forced to provide involuntary statements to Respondents' agents both prior to and after his arrival at Guantánamo. Petitioner has been terribly abused and tortured by Respondents' agents.

61. Petitioner Aamer has been held under conditions that violate his international and constitutional rights to dignity and freedom from cruel, unusual and degrading treatment or punishment. He has been housed throughout his detention in accommodation that fails to satisfy both domestic and internationally accepted standards of accommodation for any person subject to detention. He has been refused meaningful access to their families. He has not been provided with the opportunity fully to exercise his religious beliefs. He has been exposed to the indignity and humiliation of the cameras of the national and international press, brought to Guantánamo with the express consent and control of Respondents.

**The Detention Order**

62. On November 13, 2001, Respondent Bush issued a Military Order authorizing indefinite detention without due process of law. The Order authorizes Respondent Rumsfeld to detain anyone Respondent Bush has "reason to believe":

    i.   is or was a member of the organization known as al Qaida;
    ii.  has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or
    iii. has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

    *See Military Order of November 13, 2001.* President Bush must make this determination in writing. The Order was neither authorized nor directed by Congress, and is beyond the scope of the Joint Resolution of September 18, 2001.

63. The Military Order vests the President with complete discretion to identify the individuals that fall within its scope. It establishes no standards governing the use of his discretion. Once a person has been detained, the Order contains no provision for the person to be notified of the charges he may face. On the contrary, the Order authorizes detainees to be held without charges. It contains no provision for detainees to be notified of their rights under domestic and international law, and provides neither the right to counsel, nor the right to consular access. It provides no right to appear before a neutral tribunal to review the legality of a detainee's continued detention and no provision for appeal to an Article III court. In fact, the Order expressly bars review by any court. The Order authorizes indefinite and unreviewable detention, based on nothing more than the President's written determination that an individual is subject to its terms.

64. The Military Order was promulgated in the United States and in this judicial district, the decision to detain Petitioners was made by Respondents in the United States and in this judicial district, the decision to detain Petitioners at Guantánamo was made in the United States and in

this judicial district, and the decision to continue detaining the Petitioners was, and is, being made by Respondents in the United States and in this judicial district.

65. Respondent Bush has never certified or determined in any manner, in writing or otherwise, that the detained Petitioners are subject to this detention order.

66. Petitioners are not properly subject to this detention order.

67. In the related case of *Rasul v. Bush*, 215 F. Supp. 2d 55 (D.D.C. 2002), Respondents contended that the men held in Guantanamo were being detained not pursuant to the President's Military Order but rather under the President's authority as Commander in Chief and under the laws and usages of war. However, Petitioners was not arrested or detained by the United States in the course of the armed conflict.

68. Petitioners, on information and belief, were not arrested in Afghanistan, but elsewhere, nowhere near the battlefield. Accordingly, Petitioners are not properly detained under the President's authority as Commander in Chief and under the laws and usages of war.

### Guantánamo Bay Naval Station

69. On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray, at the United States Naval Base, in Guantánamo Bay, Cuba. In April 2002, all prisoners were transferred to a more permanent prison facility in Guantánamo, Camp Delta. Guantánamo is a self-sufficient and essentially permanent city with approximately 7,000 military and civilian residents under the complete jurisdiction and control of the United States. Guantánamo occupies nearly thirty-one square miles of land, an area larger than Manhattan, and nearly half the size of the District of Columbia. It has its own schools, generates its own power, provides its own internal transportation, and supplies its own water. Offenses committed by both civilians and foreign nationals living on Guantánamo are brought before federal courts on the mainland, where respondents enjoy the full panoply of Constitutional rights.

70. The United States has occupied Guantánamo since 1903, and has repeatedly declared its intention to remain there indefinitely. For several decades, the United States has resisted claims of national sovereignty made by Cuba over Guantánamo, insisting that its occupation of

the land is legal and will remain so in perpetuity, so long as the United States chooses to exercise dominion and control over the land. The area is now, and has been for many years, under exclusive United States jurisdiction.

71. Guantánamo has developed into a fully American enclave with all the residential, commercial, and recreational trappings of a small American city. The infrastructure is permanent and complex, providing for a wholly self-sufficient American community. The "Gitmo Guide", available online, lists fifteen restaurants, a bowling alley, and a Baskin Robbins. *See* The Gitmo Guide, at http://www.geocities.com/Pentagon/ 6625/dining.html. Guantánamo contains an outdoor movie theater, a McDonald's and a mini-mall. http://www.cubanet.org/CNews/y02/jan02/15e5.htm. Residents, as well as their children, enjoy a number of recreational activities and clubs, including the Boys Scouts, Cub Scouts, USA Girl Scouts, the Guantánamo Bay Little Theater Company, an Archery Club, a golf club and even a Star Trek club. Residents may participate in a number of different sports including golf, hunting, tennis, horseback riding, football, softball and soccer.

72. A small children's zoo has been established on the naval base which contains "goats, donkeys, iguanas and banana rats." To facilitate water recreation for the residents, the bay side beaches have been dredged and pooled to protect bathers from the undertow and swift tidal current in the bay. "Gitmo boasts its own yacht club, which conducts races nearly every week ... [requiring] all boats ... to fly the United States flag"[1] The United States has established 'America's Slice of Cuba,'[2] where the residents "live in American-style homes, shop for American products and drive American cars. They have cable TV and radio stations, and their children attend schools that could be found in any suburban neighborhood."[3]

---

[1] Theodore K Mason, *Across the Cactus Curtain* at 106 (1984) (Library of Congress Cataloging in Publication Data).

[2] *See* Tom Gibbs, *World Americas, America's Slice of Cuba* (BBC Online Network, Friday January 1, 1999).

[3] http://www.sun-sentinel.com/news/local/cuba/sns-gitmo-galleryindex.photogallery?coll=sfla-news-cuba-(*Inside Guantánamo Bay Naval Station*).

73. In light of the foregoing, the United States Navy has accurately described Guantánamo as "a Naval reservation *which, for all practical purposes, is American territory.* Under the [lease] agreements, *the United States has for approximately [ninety] years exercised the essential elements of sovereignty over this territory,* without actually owning it. Unless we abandon the area or agree to a modification of the terms of our occupancy, we can continue in the present status as long as we like. [According to the United States p]ersons on the reservation are amenable only to United States legislative enactments." *See* The History of Guantánamo Bay: An Online Edition (1964), available at http://www.nsgtmo.navy.mil/ history.htm.

74. On or about January 11, 2002, the precise date unknown to counsel but known to Respondents, the United States military transferred the detained Petitioners to Guantánamo, where they have been held ever since, in the custody of Respondents Bush, Rumsfeld, Hood, and Cannon.

75. Since gaining control of the detained Petitioners, the United States military has held him virtually *incommunicado*. He has been or will be interrogated repeatedly by agents of the United States Departments of Defense and Justice, though he has not been charged with an offense, nor have they been notified of any pending or contemplated charges. They have made no appearance before either a military or civilian tribunal of any sort, nor have they been provided counsel or the means to contact counsel. They have not been informed of their rights under the United States Constitution, the regulations of the United States Military, the Geneva Convention, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, or customary international law. Indeed, Respondents have taken the position that they should not be told of these rights. As a result, the detained Petitioners are completely unable either to protect, or to vindicate their rights under domestic and international law.

76. In published statements, Respondents Bush, Rumsfeld, and officers Lehnert and Carrico who preceded Hood and Cannon in their respective positions, indicated the United States may hold the detained Petitioners under these conditions indefinitely. *See, e.g.,* Roland Watson, THE TIMES (LONDON), Jan. 18, 2002 ("Donald Rumsfeld, the U.S. Defence Secretary, suggested last night that al-Qaeda prisoners could be held indefinitely at the base. He said that the detention

of some would be open-ended as the United States tried to build a case against them."); Lynne Sladky, ASSOC. PRESS, Jan. 22, 2002 ("Marine Brig. Gen. Mike Lehnert, who is in charge of the detention mission, defended the temporary cells where detainees are being held... 'We have to look at Camp X-ray as a work in progress...,' Lehnert told CNN. ... Lehnert said plans are to build a more permanent prison 'exactly in accordance with federal prison standards'"); John Mintz, The WASH. Post, *Extended Detention In Cuba Mulled*, Feb. 13, 2002 ("As the Bush administration nears completion of new rules for conducting military trials of foreign detainees, U.S. officials say they envision the naval base at Guantánamo Bay, Cuba, as a site for the tribunals and as a terrorist penal colony for many years to come.").[4]

## V
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (DUE PROCESS – FIFTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION)

77. Petitioners incorporate all of the above paragraphs by reference.

78. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the Fifth Amendment to the United States Constitution. Respondent Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals, without Due Process of Law. Respondents Rumsfeld, Hood, and Cannon are likewise acting in violation of the Fifth Amendment, since they act at the President's direction. On its face, the Executive Order violates the Fifth Amendment.

### SECOND CLAIM FOR RELIEF
### (DUE PROCESS – FIFTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION)

79. Petitioners incorporate all of the above paragraphs by reference.

---

[4] *See also* TIME MAG., *Welcome to Camp X-Ray*, Feb. 3, 2002:

> More curious still is the matter of the prisoners' ultimate fate. Rumsfeld has laid out four options: a military trial, a trial in U.S. criminal courts, return to their home countries for prosecution, or continued detention 'while additional intelligence is gathered.' The last seems a distinct possibility; the Pentagon plans to build 2,000 cells at Camp X-Ray.

80. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of the detained Petitioners to be free from arbitrary, prolonged, and indefinite detention, in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. The Executive Order, as applied to Petitioners, violates the Fifth Amendment.

### THIRD CLAIM FOR RELIEF
### (DUE PROCESS – INTERNATIONAL LAW)

81. Petitioners incorporate all of the above paragraphs by reference.

82. By the actions described above, Respondents, acting under color of law, have violated and continue to violate customary international law, Arts. 9 and 14 of the International Covenant on Civil and Political Rights, and Arts. XXVIII, XXV, and XXVI of the American Declaration on the Rights and Duties of Man. Respondent Bush has ordered the prolonged, indefinite, and arbitrary detention of Petitioners, without legal process, in violation of binding obligations of the United States under international law. Respondents Rumsfeld, Hood, and Cannon are likewise acting in violation of international law, since they act at the President's direction. On its face, the Executive Order violates international law.

### FOURTH CLAIM FOR RELIEF
### (DUE PROCESS – INTERNATIONAL LAW)

83. Petitioners incorporate all of the above paragraphs by reference.

84. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of the detained Petitioners to be free from arbitrary, prolonged, and indefinite detention, in violation of customary international law, Arts. 9 and 14 of the International Covenant on Civil and Political Rights, and Arts. XXVIII, XXV, and XXVI of the American Declaration on the Rights and Duties of Man. The Executive Order, as applied to the detained Petitioners, violates these and other binding obligations of the United States under International Law.

### FIFTH CLAIM FOR RELIEF
### (DUE PROCESS – FAILURE TO COMPLY WITH U.S. MILITARY REGULATIONS AND INTERNATIONAL HUMANITARIAN LAW)

85. Petitioners incorporate all of the above paragraphs by reference.

86. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the rights accorded to persons seized by the United States Military in times of armed conflict, as established by, *inter alia*, the regulations of the United States Military, Articles 4 and 5 of Geneva Convention III, Geneva Convention IV, and customary international law.

### SIXTH CLAIM FOR RELIEF
### (WAR POWERS CLAUSE)

87. Petitioners incorporate all of the above paragraphs by reference.

88. By the actions described above, Respondents, acting under color of law, have exceeded the constitutional authority of the Executive and have violated and continue to violate the War Powers Clause by ordering the prolonged and indefinite detention of the detained Petitioners without Congressional authorization.

### SEVENTH CLAIM FOR RELIEF
### (SUSPENSION OF THE WRIT)

89. Petitioners incorporate all of the above paragraphs by reference.

90. To the extent the order of November 13, 2001, disallows any challenge to the legality of the Petitioners' detention by way of habeas corpus, the Order and its enforcement constitute an unlawful Suspension of the Writ, in violation of Article I of the United States Constitution.

## VI
## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for relief as follows:

1. Grant Petitioners Next Friend status, as it may be necessary;

2. Order the detained Petitioners released from Respondents' unlawful custody;

3. Order Respondents to allow counsel to meet and confer with the detained Petitioners, in private

and unmonitored attorney-client conversations;

4. Order Respondents to cease all interrogations of the detained Petitioners, direct or indirect, while this litigation is pending;

5. Order the Respondents not conduct or permit a Combatant Status Review Tribunal to be held in Petitioners' cases;

6. Order and declare the Executive Order of November 13, 2001, unlawful as a violation of the Fifth and Fourteenth Amendments to the United States Constitution;

7. Order and declare the Executive Order of November 13, 2001, unlawful as a violation of the Administrative Procedures Act, 5 U.S.C. § 702;

8. Order and declare that the detained Petitioners are being held in violation of the Fifth and Fourteenth Amendments to the United States Constitution;

9. Order and declare the Executive Order of November 13, 2001, unlawful as a violation of customary international law, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man;

10. Order and declare that the detained Petitioners are being held in violation of customary international law, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man;

11. Order and declare that the detained Petitioners are being held in violation of the regulations of the United States Military, the Geneva Conventions, and international humanitarian law;

12. Order and declare that the Executive Order of November 13, 2001, violates the War Powers Clause;

13. Order and declare that the provision of the Executive Order that bars the detained Petitioners from seeking relief in this Court is an unlawful Suspension of the Writ, in violation of Article I of the United States Constitution;

14. To the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing, at which Petitioners may adduce proof in support of his allegations; and

15. Grant such other relief as the Court may deem necessary and appropriate to protect Petitioners' rights under the United States Constitution and international law.

Dated: Washington, D.C.
     December 21, 2004

                                        Respectfully submitted,

                                        Counsel for Petitioners:

                                        James W. Beane Jr.
                                        U.S. District Court for the
                                              District of Columbia Bar No. 444920
                                        803 Florida Avenue, N.W.
                                        Washington, D.C. 20001
                                        (202) 257-3920 (tel)
                                        (703) 354-3456 (fax)
                                        e-mail: beane.law@verizon.net

                                        Clive A. Stafford Smith*
                                        Admitted in the States of Georgia, Louisiana &
                                        Mississippi
                                        636 Baronne Street
                                        New Orleans, La. 70113
                                        (504) 558 9867
                                        e-mail: clivessgb@aol.com

                                                   *Counsel for Petitioners*

\* Mr. Stafford Smith has previously been admitted pro hac vice in connection with the Guantanamo Bay litigation

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this _21_ day of December, 2004.

_____
James W. Beane, Jr.