**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SHAKER AAMER (ISN 239), NABIL HADJARAB (ISN 238), AND AHMED BELBACHA (ISN 290), | ) ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action Nos. 04-2215 (RMC) 05-1504 (RMC) |
| BARACK H. OBAMA,[1] *et al.*, | ) ) | 05-2349 (RMC) |
| Respondents. | ) ) | |

**OPINION**

Shaker Aamer, Nabil Hadjarab, and Ahmed Belbacha are detained at Guantanamo Bay, Cuba. They have all been cleared for release.[2] In protest of their continued detention, they have joined others at Guantanamo Bay in a lengthy hunger strike. Petitioners wish to starve themselves, perhaps to death. The Joint Medical Group (JMG) relies on enteral feeding when detainees refuse to take nutrients orally to keep themselves alive and healthy. Petitioners seek an injunction against the Government's insistence on feeding them through a nasogastric tube ("force-feeding") to maintain their lives.[3] Petitioners contend that such feeding violates their

---

[1] Former President George W. Bush was named as the original Respondent in this case. Pursuant to Federal Rule of Civil Procedure 25(d), his successor, President Barack H. Obama, is substituted.

[2] *See* Notice Lifting Protected Information Designation of Decisions by the Guantanamo Bay Review Task Force [Dkt. 220], Ex. 1 (listing Guantanamo detainees and indicating "cleared for transfer," "detention continued," or "referred for prosecution").

[3] Petitioners filed identical motions in their cases: *Aamer v. Obama*, Civil No. 04-2215, *Hadjarab v. Obama*, Civil No. 05-1504, and *Belbacha v. Obama*, Civil No. 05-2349. The docket

1

right to commit suicide and will deprive them of their ability to fast during daylight hours during Ramadan, which began on July 8, 2013. Petitioners misstate some important facts and misapprehend the law. Their motions for preliminary injunction will be denied.

## I. FACTS

The basic facts are not in dispute. Since February 2013, a number of Guantanamo Bay detainees have engaged in a hunger strike to protest their detention. Petitioners have all been designated as hunger strikers by the medical staff at Guantanamo Bay, and Messrs. Hadjarab and Belbacha have been further approved for enteral feeding via nasogastric tube. Opp'n [Dkt. 215], Ex. 1, Senior Medical Officer (SMO) Decl. [Dkt. 215-1] ¶¶ 21-23.[4]

Specific policies and procedures govern the medical staff's decisions to maintain health and life. *See id*. ¶¶ 9-19. JMG designates detainees as hunger strikers based on a detainee's intent and behavior, as well as weight loss to less than 85% of Ideal Body Weight and/or missing nine consecutive meals. *Id*. ¶ 10. Thereafter, a detainee's health is carefully monitored, and he is provided extensive counseling and detailed warnings that continued refusals to eat or drink could endanger his health or life. *Id*. "During these conversations, the medical personnel explain that their role is to preserve and promote the detainee's life and health (not to

---

numbers referenced in this Opinion refer to the filings as listed in the docket pertaining to Mr. Aamer, Civil No. 04-2215.

[4] The Senior Medical Officer is a medical doctor responsible for the medical care provided to detainees at Guantanamo Bay. SMO Decl. ¶ 1. The Government designated the identity of the Senior Medical Officer as protected information in accordance with the Protective Order and for the same reasons that Judge Hogan approved protecting the identities of other Government personnel. *See In re Guantanamo Bay Detainee Litig*., 787 F. Supp. 2d 5, 15-17 (D.D.C. 2011). The Government filed a public version of the SMO Declaration, *see* Dkt. 215-1, and filed under seal an unredacted version, *see* Dkt. 218. The Court approves the designation of identifying information as protected information.

stop the hunger strike) and urge the detainees to voluntarily accept enough nutrients to increase their weight and improve their health." *Id*.

If a detainee's refusal to consume food or nutrients voluntarily reaches the point at which the medical staff determines that his life or health may be threatened, the medical staff will obtain authorization to feed him through a nasogastric tube. *Id*. ¶ 11.  Prior to each enteral feeding, the detainee is offered a standard meal or a liquid nutritional supplement.  He is advised again that feeding him through a nasogastric tube is done only to preserve his health and life.  *Id*. Because Petitioners allege that maintaining their health and lives this way is inhumane, the Court quotes the Senior Medical Officer at length:

> 12. The enteral feed is administered through the use of a nasogastric tube[].  Feeding through those tubes is only conducted by physicians or credentialed registered nurses, and only when medically necessary to preserve that detainee's life and health. . . .
>
> 13. When inserting nasogastric tubes, a lubricant is always used.  In all cases, a topical anesthetic such as lidocane (a widely used local anesthetic) is offered, but the detainee may decline the anesthetic.   Prior to insertion, the medical professional will lubricate a sterile nasogastric tube with a lidocane gel or surgilube, or olive oil at the detainee's request.
>
> 14. Registered nurses insert the enteral feeding tube in accordance with standard medical protocol.  JTF-GTMO [Joint Task Force, Guantanamo Bay) uses 8, 10, or 12 french tubes, which are smaller than the 16 french tubes used by the Bureau of Prisons.  A nasogastric tube is never inserted and then moved up or down.  Instead, it is inserted down into the stomach slowly and directly, and removed carefully. . . .
>
> 15. Typically, anesthetic throat lozenges are also available to the detainees on request.  After verification of tube placement, an appropriate amount of nutritional supplement formula is infused by gravity into the detainee's stomach.

*Id*. ¶¶ 12-15.  During this process, which may take thirty to forty minutes, the detainee is seated in a restraint chair, such as is used in U.S. prisons for this same purpose. *Id*. ¶ 15. "The chair is

ergonomically designed for the detainee's comfort and protection, with a padded seat and padded back support," and ensures the safety of those administering unwanted nutrition and the detainee himself. *Id.* ¶ 17. "Detainees are offered pain relievers, such as ibuprofen, if they indicate any discomfort from the feeding procedure." *Id.* ¶ 18.

In connection with this feeding protocol, Petitioners complain that they have been, or may have been, administered against their will the drug called Reglan, a treatment for nausea and vomiting. The Senior Medical Officer states, however, that "JMG protocol is to obtain voluntary and informed consent" for any medication or medical procedure unless necessary to preserve a detainee's health and life. *Id*. ¶ 19. "Reglan is very rarely used by our medical staff as there are other anti-nausea drugs that are just as effective. Reglan or other medications are not placed in the feed solutions, or otherwise given to a detainee, without his knowledge and consent." *Id.* Of the Petitioners, only Mr. Hadjarab was once prescribed Reglan in March 2013, but "he declined the medication and it has not been prescribed since that time." *Id*. ¶ 21. Messrs. Aamer and Belbacha have never been prescribed or administered Reglan. *Id*. ¶¶ 22-23.

Petitioners also base their request for injunctive relief, in part, on the fact that Ramadan started on July 8 and the feeding protocol to which they are subjected will prevent them from fasting between sunrise and sundown, as required of an observant Muslim. The Senior Medical Officer explains:

> *As has been done in the past*, barring any unforeseen emergency or operational issues, JTF-GTMO will accommodate religious practices during Ramadan . . . *JTF-GTMO will modify the hours of meal delivery, including enteral feeding, in accordance with the fasting hours*, and detainees will be provided with a mid-night [sic] snack. Although the number of enterally fed detainees is greater than in the past, JTF-GTMO has shifted existing resources and has sufficient medical personnel on hand to provide detainees with the

> proper nutrition in a manner that is in accordance with Ramadan's fasting requirements. At the end of Ramadan, detainees may participate in morning Eid prayer and feast meals will be offered to all detainees on 8 and 9 August 2013.

*Id*. ¶ 20 (emphasis added).

Reporting on the condition of these Petitioners specifically, the Senior Medical Officer states that Nabil Hadjarab is in good health and is at 95% of his ideal body weight. At times since he was approved for enteral feeding in March, he has chosen to consume food and nutritional supplements orally. *Id.* ¶ 21. Shaker Aamer is also in good health and is also at 95% of his ideal body weight; while he has been designated as a hunger striker since March, he has not been approved for enteral feeding. *Id.* ¶ 22. Ahmed Belbacha is similarly in good health; he is at 85% of his ideal body weight and has been approved for enteral feeding since April. *Id.* ¶ 23. Occasionally, Mr. Belbacha has chosen to consume food and nutritional supplements orally. The medical staff is aware of a prior nasal surgery undergone by Mr. Belbacha and "therefore makes every effort to accommodate his situation during the enteral feeding process." *Id.*

Petitioners seek a preliminary injunction precluding the Government from "force-feeding or forcibly medicating with Reglan" any of the Petitioners. *See* Proposed Order [Dkt. 212-4]. The Government opposes, notably asserting that this Court lacks jurisdiction to grant the relief Petitioners seek. *See* Opp'n [Dkt. 215].

## II. LEGAL STANDARDS

### A. Preliminary Injunction

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. Of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). An injunction is an equitable remedy, so its issuance is one which falls

5

within the sound discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). To obtain a preliminary injunction, the movant must establish that:

      (a) he is likely to succeed on the merits;

      (b) he is likely to suffer irreparable harm in the absence of preliminary relief;

      (c) the balance of equities tips in his favor; and

      (d) an injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The D.C. Circuit has further instructed that "the movant has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009);[5] *see also Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011).

### B. Jurisdiction

Before the Court can address Petitioners' request for a preliminary injunction, Petitioners must show that the Court has jurisdiction over their claim. *See Public Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342, 1346 (D.C. Dir. 2007) (jurisdiction must always be determined before any inquiry on the merits); *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) (the party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists). Federal courts are courts of limited subject matter jurisdiction; "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the

---

[5] In the past, courts have balanced the four factors on a "sliding scale," *i.e.*, a lesser showing on one factor could be surmounted by a greater showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). *Winter* called this approach into question: "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm [despite a strong likelihood of success on the merits] is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added). The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors. *See Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring).

burden of establishing the contrary rests upon the party asserting jurisdiction." *See Kokkonen v. Guardian life Ins. Co. of America*, 511 U.S. 375, 377 (1994) (internal citations omitted). No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is an Article III and a statutory requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). To determine whether it has jurisdiction, a court may consider materials outside the pleadings. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

### III.  ANALYSIS

This Court is without jurisdiction here. Congress has explicitly removed all aspects of "treatment" and "conditions of confinement" at Guantanamo Bay from the jurisdiction of federal courts. *See* 28 U.S.C. § 2241(e)(2). Further, there is nothing so shocking or inhumane in the treatment of Petitioners—which they can avoid at will—to raise a constitutional concern that might otherwise necessitate review.

Section 2241(e)(2) provides:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, *treatment*, trial or *conditions of confinement* of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant.

28 U.S.C. § 2241(e)(2). In other words, this statute expressly deprives federal courts of jurisdiction to consider actions regarding the treatment of Guantanamo detainees or their conditions of confinement.

Petitioners candidly acknowledge that "[s]everal judges of this [c]ourt have ruled that Section 7 of the Military Commissions Act of 2006 (MCA), Pub. L. 109-366, 120 Stat. 2600 (2006), to the extent it amends 28 U.S.C. § 2241(e)(2) (2012), strips federal courts of jurisdiction

7

as to any action by an enemy combatant against the United States relating to 'conditions of confinement.'" Mot. for Prelim. Inj. (Mot.) [Dkt. 212] at 24; *see e.g., Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 108-09 (D.D.C. 2010) (Huvelle, J.) (dismissing Fifth and Eighth Amendment claims based on allegations that Guantanamo detainees had been subjected to abuse because the MCA strips courts of jurisdiction over complaints related to any aspect of treatment or conditions of confinement), *aff'd*, 669 F.3d 315 (D.C. Cir. 2012); *Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 119 (D.D.C. 2009) (Kessler, J.) (dismissing Guantanamo petitioners' complaint seeking (1) to prohibit the use of the restraining chair during enteral feeding and (2) to prohibit inserting and removing feeding tube for each feeding session, because the court lacked jurisdiction to consider treatment and conditions of confinement under § 2241(e)(2)). Numerous judges in this District have determined that § 2241(e)(2) precludes jurisdiction over detainee treatment cases. *See, e.g.*, *Tumani v. Obama*, 598 F. Supp. 2d 67, 69 (D.D.C. 2009) (Urbina, J.) (finding no jurisdiction over requests for transfer to a less restrictive camp, to end interrogations, and to visit another detainee who was petitioner's father); *Al-Shurfa v. Obama*, Civ. No. 05-431, 2009 WL 1451500, at *1 (D.D.C. May 21, 2009) (Leon, J.) (holding no jurisdiction to hear treatment requests including one for transfer to a less restrictive camp); *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 312, 315-16 (D.D.C. 2008) (Hogan, J.) (finding court lacked jurisdiction to consider requests to meet with a doctor, for mattress and blanket, and for access to medical records); *Khadr v. Bush*, 587 F. Supp. 2d 225, 234-37 (D.D.C. 2008) (Bates, J.) (holding no jurisdiction to review request for transfer to a rehabilitation and reintegration program).

    Petitioners attempt to avoid a finding of no jurisdiction with a lawyerly analysis. As explained below, they argue that (1) § 2241(e)(2) does not bar their motion for injunction because they do not challenge "conditions of confinement" and (2) if it did preclude their

motion, it would constitute an unlawful suspension of the writ of habeas corpus, citing *Boumediene v. Bush*, 553 U.S. 723 (2008).

First, Petitioners argue that enteral feeding does not constitute a "condition of confinement" because the phrase has been interpreted in criminal case law to mean "any deprivation that does not affect the fact or duration of a prisoner's overall confinement." Mot. at 24 (citing *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999)). In *Jenkins*, the court also determined that "conditions of confinement" include "terms of disciplinary or administrative segregation" as well as:

> general conditions affecting a prisoner's quality of life such as: the revocation of telephone or mail privileges or the right to purchase items otherwise available to prisoners; and the deprivation of exercise, medical care, adequate food and shelter, and other conditions that, if improperly imposed, could violate the Constitution.

*Jenkins*, 179 F.3d at 28. Petitioners do not challenge a "deprivation" of food or medical care but, rather, "an unwanted direct bodily invasion." Mot. at 25. Citing *Vitek v. Jones*, 445 U.S. 480, 493 (1980), in which the Supreme Court held that the transfer of a prisoner to a mental hospital was "not within the range of conditions of confinement" contemplated by his prison sentence, Petitioners contend that a "forced invasive medical procedure is not a condition of confinement." *Id.* Further, they argue that enteral feeding *prolongs* Petitioners' confinement, thereby affecting the duration of their confinement and not the conditions of their confinement. *Id.* at 25-26 (citing *Jenkins*, 179 F.3d at 28).

This argument is disingenuous. The relief Petitioners seek can have no impact on the length of their detention as authorized by law and does not concern the duration of their confinement. Petitioners are using their motion for preliminary injunction as a vehicle for challenging their detention. This is revealed by their argument that "America's public interest

9

lies . . . in either trial or release as 'ready alternatives' to force-feeding." Reply [Dkt. 217] at 3. Petitioners, in fact, are seeking trial or release; that relief is properly the basis of their habeas petitions.[6]

Second, Petitioners argue that the "conditions of confinement" cases—*Al-Zahrani* and *Al-Adahi*—were incorrectly decided because interpreting § 2241(e)(2) so as to bar relief would constitute an illegal suspension of habeas corpus. Petitioners note that, in *Boumediene,* the Supreme Court held that 28 U.S.C. § 2241(e)(1) violated the Suspension Clause of the Constitution because the mechanism for review of detentions under the Detainee Treatment Act of 2005 was not "an adequate substitute for habeas corpus." *Boumediene*, 553 U.S. at 779. Petitioners contend that "[h]ere, there is no mechanism *at all*, much less an inadequate one, for a detainee to challenge his conditions of confinement." Mot. at 27. Further, they contend that Combatant Status Review Tribunals (CSRTs), even if still operating, would not suffice because appeal would be to the D.C. Circuit Court of Appeals, which lacks power "to admit and consider newly discovered evidence that could not have been made part of the CSRT record because it was unavailable to either the Government or the detainee when the CSRT made its findings." *Boumediene*, 553 U.S. at 790. Because this infirmity applies to § 2241(e)(2) just as it did to the invalidated § 2241(e)(1), Petitioners insist that the reasoning of *Boumediene* applies with equal force to § 2241(e)(2).

Petitioners' argument fails in light of the clear language of Congress in § 2241(e)(2), specifically *not* addressed in *Boumediene*, that deprives federal courts of

---

[6] Petitioners' habeas cases challenging their detention have not proceeded to the merits as they have agreed to stay their cases. *See Hadjarab v. Obama*, 05-cv-1504 (June 15, 2012 Minute Order granting consent motion to stay); *Belbacha v. Obama*, 05-cv-2349 (Sept. 14, 2012 Minute Order granting consent motion to stay); *Aamer v. Obama*, 04-2215 (Dec. 17, 2008 Minute Order granting Petitioner's consent motion to stay). The stay in Mr. Aamer's case was lifted on December 7, 2011, and his case is now in discovery.

jurisdiction over detainee treatment and the conditions of confinement at Guantanamo Bay.  As noted above, § 2241(e)(2) provides that no court "shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the . . . treatment . . . or conditions of confinement" of an alien detained by the United States who has been determined to be an enemy combatant.[7]  The D.C. Circuit has held that § 2241(e)(2) is a valid exercise of congressional power and that it precludes federal court jurisdiction over a case asserting Fifth and Eighth Amendment violations arising from alleged physical, psychological, and religious abuse; inadequate medical treatment; and withholding of medication.  *See Al-Zahrani*, 669 F.3d 315.  In *Boumediene*, the Supreme Court found § 2241(e)(1), the provision that barred court review of petitions for writ of habeas corpus filed by detainees, to be constitutionally defective because it violated the Suspension Clause.  *See* U.S. Const. art. 1, § 9, cl. 2 (providing that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it").  In *Al-Zahrani*, the D.C. Circuit expressly held that § 2241(e)(2), regarding treatment and conditions of confinement, "has no effect on habeas jurisdiction. The Suspension Clause is not relevant and does not affect the constitutionality as applied in 'treatment cases.'"  669 F.3d at 319 (following *Kiyemba v Obama*, 561 F.3d 509, 512 n.1 (D.C. Cir. 2009) (explaining that the Supreme Court in *Boumediene* did not invalidate the jurisdiction-stripping portion of the MCA, i.e. § 2241(e)(2))). While the Suspension Clause guarantees a detainee a meaningful opportunity to show that he is being held pursuant to an erroneous application or interpretation of law, *see Boumediene*, 553 U.S. at 779, the Suspension Clause extends no guarantee of the right to challenge treatment and conditions of confinement, such as enteral feeding.

---

[7] Although cleared for release, Petitioners do not assert that they have been determined not to be enemy combatants, at issue in their habeas cases.

This Court is bound by Circuit precedent set forth in *Al-Zahrani* and *Kiyemba*.[8] Pursuant to § 2241(e)(2), the Court lacks jurisdiction to hear or consider Petitioners' motion for preliminary injunction to enjoin enteral feeding.[9]

Even if the Court had jurisdiction to consider Petitioners' motion for preliminary injunction, the motion would be denied due to failure to show likelihood of success on the merits and because the public interest and balance of harms weighs in favor of the Government. Although framed as a motion to stop feeding via nasogastric tube, Petitioners' real complaint is that the United States is not allowing them to commit suicide by starvation. They cite copious experts who state that a sane person should be allowed to choose starvation and death over life. *See* Mot. at 15-17. Petitioners contend that life-saving treatment is not reasonably related to a legitimate penological purpose. *See Turner v Safley*, 482 U.S. 78, 89 (1987) (a prison regulation must be reasonably related to legitimate penological interests when it impinges on an inmate's constitutional rights). Even if Petitioners are accorded such constitutional rights,[10] they have not carried their burden of showing that the policy of feeding enterally hunger-striking detainees is

---

[8] Contrary to Petitioners' assertion, *see* Notice of Supp. Authority [Dkt. 222], Chief Judge Lamberth's recent ruling does not conflict with or undermine the Circuit's rulings in *Al-Zahrani* and *Kiyemba*. *See Guantanamo Bay Detainee Litigation*, Misc. No. 12-398, July 11, 2013 Op. [Dkt. 47] & July 11, 2013 Order [Dkt. 46]. In that Opinion, the district court noted that § 2241(e)(2) barred only actions regarding conditions of confinement and did not bar the court's jurisdiction to enforce the right of access to counsel as an element of habeas corpus. July 11, 2013 Op. at 14.

[9] Guantanamo detainee Jihad Dhiab filed a motion for preliminary injunction identical to the motions filed by Petitioners here. *See Dhiab v. Obama*, 05-1457 (GK), Mot. for Prelim. Inj. [Dkt. 175]. On July 8, 2013, the court denied that motion for lack of jurisdiction pursuant to § 2241(e)(2). *Id.*, Order [Dkt. 183].

[10] The proposition that Petitioners have full due process rights under the U.S. Constitution is questionable. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (the Fourth and Fifth amendments do not extend to aliens without property or presence in the United States).

unreasonable. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (the burden of proof is on the inmate to show that a prison regulation is unreasonable).

As his custodian, the United States cannot "allow" any person held in custody to starve himself to death. Whatever the medical ethics for a person at liberty, the United States as custodian has additional obligations. Numerous courts have recognized the Government's affirmative duty to prevent suicide and to provide life-saving nutritional and medical care to persons in custody.

The right to due process under the Fifth and Fourteenth Amendments does not include a right to commit suicide and a right to assistance in doing so. *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997). Moreover, under the Eighth Amendment, inmates have a right to adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials are responsible for taking reasonable steps to guarantee the safety of inmates in their charge. *Id*. Thus, "prison officials must take reasonable preventative steps when they are aware that there is a substantial risk that an inmate may attempt to take his own life." *Estate of Novak ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). The Government has a legitimate penological interest in preventing suicide, and the involuntary feeding of hunger-striking prisoners and detainees has been repeatedly upheld. *See, e.g., In re Grand Jury Subpoena*, 150 F.3d 170, 172 (2d Cir. 1998) (involuntary feeding of civil contemnor detained for refusal to testify before a grand jury did not violate the Constitution); *Garza v. Carlson*, 877 F.2d 14, 17 (8th Cir. 1989) (prisoner's constitutional rights were not violated by threat of force-feeding; preservation of prisoners' health is a legitimate objective); *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001) (enteral feeding of hunger-striking INS detainee in indefinite detention was reasonable and did not violate his rights), *vacated as moot*, 296 F.3d

1237 (11th Cir. 2002); *see also* 28 C.F.R. §§ 549.60-66 (medical officers of the Bureau of Prisons may administer medical treatment to prison inmates if it is determined that the inmate's life or permanent health is in danger). Enteral feeding also can assist in preserving order, security, and discipline in a detention facility. "If prisoners are allowed to kill themselves, prisons would find it even more difficult than they already do to maintain discipline, because of the effect of a suicide in agitating other prisoners." *Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006).[11] Accordingly, Petitioners have not shown likelihood of success on the merits.

Further, the requested injunction would increase the risk of irreparable harm to Petitioners' lives and health, and the balance of harms weighs against enjoining enteral feeding. If an injunction were granted, Petitioners would be permitted to refuse food and endanger their lives and health, possibly to the point of death. This would be contrary to the Government's duty to provide life-saving medical care to persons in custody and would undermine the security and safety of the Guantanamo facility and the detainees housed there.

Finally, it should be noted that two "facts" upon which Petitioners base their motion are inaccurate: first, no Petitioner has been administered Reglan and second, JTF-GTMO plans, as it has in the past, to adjust meal times (including enteral feeding) so that Petitioners can observe the Ramadan fast.[12] The Government has sufficient medical personnel to provide detainees with proper nutrition in a manner that complies with the fasting requirements of

---

[11] Petitioners rely on *Cruzan v. Missouri Dep't Health*, 497 U.S. 261 (1990) for the proposition that a competent person has a constitutionally protected liberty interest in refusing life-saving hydration and nutrition. *Cruzan* does not apply in the custodial context.

[12] Petitioners unsuccessfully sought the Government's consent to an order that would impose certain parameters relating to enteral feeding during Ramadan and the administration of Reglan. *See* Reply; Supp. Decl. of Crider [Dkt. 219]. Even if Petitioners had raised a factual issue, the Court lacks jurisdiction under § 2241(e)(2) to hear or consider these matters.

Ramadan.  See SMO Decl. ¶ 20.  Thus, these bases upon which they seek a preliminary injunction do not support the request.

## IV.  CONCLUSION

Accordingly, Petitioners' motions for preliminary injunction[13] will be denied, as this Court lacks jurisdiction to grant the relief requested.  A memorializing Order accompanies this Opinion.


Date:  July 16, 2013                                          /s/
                                                ROSEMARY M. COLLYER
                                                United States District Judge

---

[13] The Petitioners' identical motions for preliminary injunction are: Civil No. 04-2215 [Dkt. 212]; Civil No. 05-1504 [Dkt. 291]; and Civil No. 05-2349 [Dkt. 243].