**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SHAKER AAMER,** | |
| *Petitioner,* | |
| v. | **Case No. 04-CV-2215 (RMC)** |
| **BARACK H. OBAMA,** *et al.,* | |
| *Respondents.* | **Oral Argument Requested** |

## MOTION TO COMPEL ACCESS TO AN INDEPENDENT MEDICAL EVALUATION

Petitioner, Shaker Aamer, respectfully moves the Court to compel Respondents to permit his examination by a medical expert of his choice, retained by undersigned counsel.[1]  Although he was cleared for release from the prison facilities at the U.S. Naval Station in Guantánamo Bay, Cuba ("Guantánamo") years ago by the U.S. government's own interagency process, Mr. Aamer has remained in U.S. custody for over eleven years now.  In that time, he has been subjected to numerous abuses by his captors.  These include physical and psychological coercion associated with interrogations, prolonged solitary confinement, deplorable sanitary conditions, refusal to treat Mr. Aamer's various medical conditions properly, and punishment and retaliation in response to Mr. Aamer's current peaceful hunger strike.

An examination by an independent medical expert is needed for the Court to exercise its jurisdiction meaningfully by accurately assessing the reliability and voluntariness of any statements Mr. Aamer reportedly gave American (and any other) interrogators.  The examination will also aid the Court and undersigned counsel in determining if Mr. Aamer can fully participate

---

[1]  Pursuant to Local Civ. R. 7(m), undersigned counsel contacted Respondents' counsel to seek their consent to the relief sought herein.  On July 19, 2013, Respondents informed counsel that they would oppose the instant Motion.

in his habeas proceedings.  Additionally, as his past and continued mistreatment threatens irreparable harm, Mr. Aamer is entitled to the relief sought herein in the form of an injunction.

## BACKGROUND

Shaker Aamer has faced torture and mistreatment since he was taken into U.S. custody. Such past and ongoing abuse warrants access to an independent medical expert to accurately assess the reliability of any statements he reportedly made to American (and any other) agents and to determine if Mr. Aamer can meaningfully participate in his ongoing habeas corpus proceedings.

### Bagram Airbase

Mr. Aamer is a long-term British resident with a wife and four children in the United Kingdom, the youngest of whom he has not met due to his imprisonment since 2001.  Decl. of Shaker Aamer in Support of Pet'rs' Mot. to Compel Access to an Independent Medical Evaluation ("Aamer Decl.") ¶¶ 1, 3, attached as Ex. A.  Almost immediately upon arrival into U.S. custody at Bagram Airbase, Afghanistan ("Bagram"), in December 2001, Mr. Aamer was subjected to physical and psychological torture.  *Id.* at ¶ 5.  Interrogators repeatedly slammed his head into the wall with such force that his head bounced off the wall—a practice known as "walling."  *Id.* at ¶ 14.  For several days, military personnel housed him in a cage surrounded by barbed wire.  *Id.* at ¶¶ 8, 9.  They forced him to use the toilet in front of fifteen people while they pointed their M-16 rifles at him, and then they forced him to get up before he finished.  *Id.* at ¶ 12.  As a result, Mr. Aamer was unable to defecate for 25 days and had horrible constipation, followed by bleeding.  *Id.* at ¶ 13.

During interrogations, U.S. agents threatened Mr. Aamer with death if he did not answer their questions.  *Id.* at ¶ 14.  At one point, they left him in the interrogation room alone with a

gun on the table. *Id.* at ¶ 15. This was a terrifying and confusing experience for him. *Id.* U.S. military personnel doused him with cold water in the middle of winter, while they kept him in a cage in the cold, from which Mr. Aamer thought he would die from hypothermia. *Id.* at ¶ 17. They also "hog-tied" him, by tying his wrists behind his back and then tying a rope from there to his ankles. *Id.* at ¶ 18. Military personnel tied another rope around his neck, so that if he struggled, he would strangle himself. *Id.* They also used "strappado" on Mr. Aamer, a form of torture used during the Spanish Inquisition, where they hung him by his arms with his feet barely off the ground, resulting in the dislocation of his shoulders and causing him excruciating pain. *Id.* at ¶ 19.

While at Bagram, U.S. military personnel subjected Mr. Aamer to sleep deprivation for several days, as the guards were under orders to keep the prisoners awake by making loud noises. *Id.* at ¶ 20. Interrogators threatened Mr. Aamer with rendition to countries such as Egypt, Israel and Jordan where he would undergo further torture. *Id.* at ¶ 21. Interrogators told him that they were holding his family and would torture them if Mr. Aamer did not tell interrogators what they wanted to hear. *Id.* at ¶ 22.

### Kandahar Prison

Mr. Aamer was subsequently taken to Kandahar Prison in Afghanistan ("Kandahar") in January 2002. *Id.* at ¶ 29. There, he faced similar torture to what he survived at Bagram, including sleep deprivation and physical abuse. Decl. of Clive Stafford-Smith in Support of Pet'rs' Mot. to Compel Access to an Independent Medical Evaluation ("Stafford Smith Decl.") ¶ 8, attached as Ex. B. While at Kandahar, he was held in a cage outdoors that was encased in barbed wire. *Id.* Furthermore, during his time at Kandahar, not even the Red Cross had access

to him.  Aamer Decl. Ex. A, at ¶ 23.  This total lack of access to the outside world led Mr. Aamer

to think he had been "disappeared," never to be heard from again.  *Id.* at ¶ 23.

### Guantánamo Bay

After Mr. Aamer was transferred to Guantánamo in February 2002, he was subjected to

regular beatings, sleep deprivation, temperature extremes, denied access to fresh air and

recreation, and kept for several years in solitary confinement.  Aamer Decl. Ex. A, at ¶ 35.

Military personnel use loud noises, bright lights and noxious smells to prevent Mr. Aamer from

sleeping.   Decl. of Ramzi Kassem in Support of Pet'rs' Mot. to Compel Access to an

Independent Medical Evaluation ("Kassem Decl.") ¶¶ 18-19, attached as Ex. C.  He was denied

the use of a shower for almost two months and was forced to use the water from his toilet to

clean himself.  *Id.* at ¶ 7.  Guards have desecrated religious materials in front of him.  Aamer

Decl. Ex. A, at ¶ 42.  He has been subjected to "noise treatment" where he is blasted with loud

noise to adversely affect him psychologically, to prevent sleep and to prevent him from

communicating with other prisoners.  *Id.* at ¶¶ 45, 46.  Mr. Aamer has also been subjected to

"sleep adjustment," where he is kept up all night but only allowed to sleep for a short period of

time during the day.  *Id.* at ¶ 47.  This also has had significant psychological effects on him.  *Id.*

at ¶ 47.

Mr. Aamer was held incommunicado for the first four years of his confinement.  Aamer

Decl. Ex. A, at ¶ 50.  He was not allowed any direct contact, such as a phone call, with his family

for eight years.  *Id.* at ¶ 52.  He has been held in solitary confinement at Guantánamo since 2004;

although he occasionally saw breaks in this isolation, those breaks have been short and always

end with his return to isolation.  Stafford-Smith Decl. Ex. B, at ¶ 23.

**Present Conditions**

In recent months, Mr. Aamer has at times only been allowed two hours of recreation per day.  Kassem Decl. Ex. C, at ¶ 9.  In protest of his imprisonment and continued mistreatment, Mr. Aamer refuses to leave the recreation area when this short period is over and is forcibly taken back to his cell by a team of guards.  *Id.*  In this process, known to prisoners as "IRFing," in reference to the "Immediate Reaction Force" ("IRF") composed of guards in riot gear, Mr. Aamer is beaten by the guards and sometimes choked.  *Id.* at ¶¶ 6, 9.  Typically, six IRF guards rush at Mr. Aamer and slam him face down to the floor.  *Id.* at ¶ 10.  Four of the guards grab his arms and legs, a fifth grabs his head, and the sixth oversees the entire operation, often as others watch and even record what is happening with a handheld video-camera.  *Id.*  After handcuffing Mr. Aamer from behind with cutting restraints, they subject him to a humiliating body search.  *Id.*

Once the IRF team has forced Mr. Aamer back into his cell, they again slam him face down to the floor, pressing his arms and crossed feet together behind his back, with their cumulative weight against his arms, feet, and back.  *Id.* at ¶ 11.  The lead IRF guard then holds Mr. Aamer's crossed feet and arms pressed down together against Mr. Aamer's back in a single point, against which the other five IRF guards again bear down with their cumulative weight.  *Id.*  Mr. Aamer has described his resulting state of mind as follows: "I am very worried about my health and my life in this place, I feel so vulnerable and anytime they can do anything to me, no one knows."  *Id.* at ¶ 23.

Mr. Aamer suffers from many physical ailments such as kidney pain, arthritis, edema, asthma, tinnitus, constant constipation and stomach pain; but he has routinely been denied adequate medical care while at Guantánamo.  Aamer Decl. Ex. A, at ¶ 49.  Mr. Aamer alleges

that this denial of adequate medical care is part of his punishment. *Id.* He has an enlarged prostate but has been denied medical supplements for this condition and denied follow-up testing to determine whether it is cancerous. Stafford-Smith Decl. Ex. B, at ¶ 45. Prison authorities decided to forbid Mr. Aamer all access to the showers as punishment for his sit-ins in the recreation area. Kassem Decl. Ex. C, at ¶ 16. He was told by authorities that when he decides to return to his cell voluntarily, then he will be permitted to use the showers. *Id.*

Mr. Aamer is currently participating in a hunger strike to peacefully protest the fact and conditions of his continued, indefinite imprisonment without charge. Stafford-Smith Decl. Ex. B, at ¶ 24; Kassem Decl. Ex. C, at ¶ 26. Other prisoners are also on hunger strike, and some of them are in the hospital. Stafford-Smith Decl. Ex. B, at ¶¶ 24-25. In retaliation for Mr. Aamer's participation in the hunger strike, the guards have subjected him to additional sleep deprivation and physical abuse. *Id.* at ¶¶ 24, 37-38. In the lead up to the Muslim holy month of Ramadan, the sleep deprivation techniques escalated: guards slammed the doors near Mr. Aamer's cell up to 300 times a night. *Id.* at ¶ 39. The guards have also begun to use dog leashes on the prisoners. *Id.* at ¶ 36. When Mr. Aamer refuses to be put on a dog leash and to be treated like an animal, he is assaulted by the guards. *Id.* Prior to this latest round of hunger strikes, the guards at Guantánamo used a board to carry him after the IRF procedure. *Id.* at ¶ 26. Since the hunger strikes began, guards have stopped using the board, severely exacerbating his back injury. *Id.* At one point, Mr. Aamer spoke with the Guantánamo medical staff to have the IRF team use a board again. *Id.* at ¶ 28. Despite the medical corpsman agreeing that Mr. Aamer's back injury requires the use of the board by the IRF team, the team still refuses to use it. *Id.*

During recent "IRFings" in response to Mr. Aamer's hunger strike, one of the guards, who weighs approximately 300 pounds, has been kneeing Mr. Aamer in the back and putting all

of his weight on top of Mr. Aamer as he holds him to the ground.  Stafford-Smith Decl. Ex. B, at ¶ 28.  During one of these recent incidents, this particular guard continued to put all of his weight on Mr. Aamer's back until Mr. Aamer heard his back crack.  *Id*.  Mr. Aamer is very worried about being paralyzed from one of these brutal encounters, as two other prisoners were paralyzed after attacks by guards.  *Id.* at ¶ 29.  He has reported: "My back and my neck are getting worse day by day. I don't want the end of this torture here to be paralyzed.  I want to carry my kids when I get home; I don't want my kids to have to wash me.  I don't want to be the third one paralyzed in this place."  *Id*.

By April 2013, Mr. Aamer had lost more than 30 pounds.  Stafford-Smith Decl. Ex. B, at ¶ 24.  By the end of June 2013, his weight loss totaled 60 pounds.  He was skin on bone, with his ribs protruding sharply from beneath his skin.  Kassem Decl. Ex. C, at ¶ 26.  Mr. Aamer has been badly punished by military personnel for joining the hunger strike. Stafford-Smith Decl. Ex. B, at ¶¶ 24-41.   Respondents have denied him various items that were ordered for medical reasons including a second mat (for his back), his blanket (for arthritis), his knee brace (for his knee injury), his back brace (for his back problems), and the pressure socks for the edema in his feet. *Id*. at ¶ 44.  Military personnel recently denied him any water for 24 hours as punishment for his hunger strike.  *Id.* at ¶ 33.  The IRF team attacks Mr. Aamer when he asks for medical attention. *Id.* at ¶ 31.  Mr. Aamer consistently sustains injuries when the IRF team attacks him. Stafford-Smith Decl. Ex. B, at ¶¶ 18, 28-29; Kassem Decl. Ex. C, at ¶¶ 10-11.  "I can't read.  I am dizzy and I fall down all the time.  I do not call [the guards or medical staff], as it is humiliating," Mr. Aamer has reported.  Stafford-Smith Decl. Ex. B, at ¶ 53.  Recently, he further stated: "I am losing my mind, I am losing my health, I am losing my life.  They are trying to do as much damage to us as they can before we leave here.  They are humiliating us as much as they can.

They are harming me as much as they can." *Id*. at ¶ 54.  The guards and medical staff also hide their identification numbers so prisoners cannot identify them and lodge complaints against them.  Stafford-Smith Decl. Ex. B, at ¶ 27; Kassem Decl. Ex. C, at ¶ 15.

In the past, in response to Mr. Aamer's hunger striking, medical personnel subjected him to brutal force feeding.  Aamer Decl. Ex. A, at ¶¶ 60-63.  They inserted a very thick tube up his nose and down into his stomach.  *Id.* at ¶ 62.  Large quantities of liquid were pumped through the tube; and this would cause vomiting, nausea, bloating and shortness of breath.  *Id.*  Medical personnel left the tube in for a long period of time, causing Mr. Aamer discomfort; and then U.S. commanders decided to change the routine to make the procedure "less convenient" for the prisoners.  *Id.* at ¶ 63.  Medical personnel then inserted the tubes and pulled them out twice per day, which was far more painful.  *Id.*  This was done to dissuade prisoners from protesting their mistreatment.  *Id.*  Over the course of his most recent protest Mr. Aamer has lost approximately 60 pounds down from his previous weight of 208 pounds.  Kassem Decl. Ex. C, at ¶ 26.  Military medical staff may subject him to these brutal force-feeding techniques again in response to his current hunger strike.  *See* Aamer Decl., Ex. A, at ¶¶ 60-63; Stafford-Smith Decl. Ex. B, at ¶¶ 40-41; *see also,* JOINT TASK FORCE GUANTANAMO BAY, CUBA - JOINT MED. GRP. *Standard Operating Procedure: Medical Management of Detainees on Hunger Strike*, SOP No.: JTF-JMG #001, Mar. 5, 2013 (detailing threshold at which force-feeding is initiated at Guantánamo).[2]

Mr. Aamer has told counsel that the conditions of his confinement have interfered with his ability to think about his case, to help his attorneys by preparing for meetings or responding to legal mail with necessary information for his case.  Kassem Decl. Ex. C, at ¶ 4.  Military personnel also punish Mr. Aamer for having phone calls with his counsel.  Stafford-Smith Decl. Ex. B, at ¶ 42.  "Each phone call [from a lawyer] is a curse," Mr. Aamer has reported to counsel.

---

[2]  *Available at* http://www.aljazeera.com/humanrights/2013/05/201358152317954140.html.

*Id*.  After a phone call with one of his lawyers, the guards treat him harshly and use any information that he has shared with his lawyers against Mr. Aamer.  *Id*.  Recently, the guards violently attacked him using the IRF procedure when Mr. Aamer demanded his legal materials back from them.  *Id*. at ¶ 43.  Pages remain missing from his legal materials after they were returned.  *Id*.

## ARGUMENT

This Court should compel Respondents to allow a medical expert of Petitioner's choice, retained by undersigned counsel and independent of Respondents, to conduct a physical and psychological examination of Mr. Aamer at Guantánamo.  Under the All Writs Act courts may "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C.A. § 1651 (West, Westlaw through Pub. L. No. 113-31).  Respondents' abuses of Mr. Aamer call into question the veracity of any statements he has reportedly made while in their custody.  The government is likely to rely on such statements in its attempt to justify Mr. Aamer's indefinite detention to this Court.  In order to exercise its jurisdiction properly over this case following the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), it would be "necessary" and "appropriate" for this Court to allow Mr. Aamer to refute the reliability of any such statements.  The Court should therefore compel an independent medical evaluation of Mr. Aamer to shed necessary light on the various forms of abuse that he has survived in Respondents' custody and the impact of those abuses on the voluntariness and reliability of any statements he has reportedly made while in Respondents' custody.

Moreover, Mr. Aamer's failing health due to past and ongoing abuses at the government's hands threatens his ability to participate in these habeas corpus proceedings.  The

independent medical examination sought herein would enable the Court and undersigned counsel to gauge the extent to which ongoing abuses compromise Mr. Aamer's ability to participate in his own proceedings.  That information bears on any assessment of the Court's ability to conduct a "meaningful review" of Mr. Aamer's case and of the evidence against him, *Boumediene*, 553 U.S. at 779, and on the need for any further measures to preserve that ability.

Lastly, Respondents' ongoing mistreatment of Mr. Aamer threatens his health and exposes him to risk of irreparable injury.  Mr. Aamer suffers from numerous medical conditions that Respondents have refused to treat and which are in fact being exacerbated by the conditions of his imprisonment.  Respondents' abuses in response to his current hunger strike have taken both a physical as well as psychological toll on Mr. Aamer.  Undersigned counsel are unable to know for certain the full extent of this toll, but it is already clear that Mr. Aamer's health has seriously deteriorated over the course of his imprisonment.  Mr. Aamer is entitled to the relief sought herein in the form of a preliminary injunction because of the irreparable injury likely to result in the absence of a reliable examination by an independent medical expert that might found further prophylactic measures.[3]

## I.   ACCESS TO AN INDEPENDENT MEDICAL EXPERT IS NECESSARY AND APPROPRIATE TO PROTECT AND EXERCISE THIS COURT'S HABEAS CORPUS JURISDICTION

The Court has the authority to protect its jurisdiction pursuant to the All Writs Act, which enables courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C.A. § 1651 (West, Westlaw through Pub. L. No. 113-31).  The All Writs Act permits the Court to fashion procedures in aid of the

---

[3]  The injuries asserted and relief sought herein are distinct from those that were at issue in *Aamer v. Obama*, No. 04-2215, 2013 WL 3651393 (D.D.C. July 16, 2013), appeal docketed, No. 13-5223 (D.C. Cir. July 22, 2013), in which Petitioner sought to have the Court enjoin Respondents from force-feeding him.

Court's jurisdiction and in order to develop a factual record to make a decision on the merits of Petitioner's habeas claims. *Al Odah v. United States*, 346 F. Supp. 2d 1, 6 (D.D.C. 2004). Additionally, the All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). In the Guantánamo context, relying on this authority, courts have issued orders to protect their jurisdiction even while that very jurisdiction was being questioned. *See Belbacha v. Bush*, 520 F.3d 452, 457 (D.C. Cir. 2008) (staying transfer of Guantánamo prisoner to Algeria while *Boumediene* was pending Supreme Court review because transfer would permanently sever jurisdiction if Supreme Court were to find that it existed).

An examination of Mr. Aamer by an independent medical expert is necessary and appropriate to aid this Court's habeas jurisdiction in two independently sufficient ways. First, the opinion of an expert with no ties to the government would shed necessary light on Mr. Aamer's consistent accounts that he was interrogated while being physically and mentally abused by the government. This, in turn, would set the stage for a meaningful examination of the veracity and reliability of any reported statements offered in evidence by the government and attributed to Mr. Aamer. Second, an examination by an independent medical expert would allow the Court and Mr. Aamer's counsel to form an accurate idea of his capacity to continue participating in his proceedings. Only with this information can the Court properly assess whether or not to proceed at all and whether or not to take appropriate measures if Mr. Aamer is in danger of no longer being able to participate in his proceedings; such an assessment would enable the Court to preserve the status quo and its jurisdiction over his case.

### A. Access to an independent medical expert is necessary to assess the reliability of the evidence Respondents will use.

For the jurisdiction recognized in *Boumediene* to have any meaning, the Court must be able to investigate whether a statement introduced in evidence against a prisoner is the "unreliable product of coercion." *al-Qurashi v. Obama,* 733 F. Supp. 2d 69, 79 (D.D.C. 2010). The reliability of evidence is to be determined not only by looking at the evidence alone, but also by considering "sufficient additional information ... permit[ting the fact finder] to assess its reliability." *Bensayah v. Obama,* 610 F.3d 718, 725-26 (D.C. Cir. 2010) (quoting *Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008)).   The D.C. Circuit has consistently held that, although hearsay evidence may be admissible in these cases, courts have to assess its weight and gauge its reliability.  *See, e.g., Barhoumi v. Obama*, 609 F.3d 416, 422 (D.C. Cir. 2010); *see also Almerfedi v. Obama*, 654 F.3d 1, 5 (D.C. Cir. 2011) (courts judge reliability of evidence by preponderance).  Further, when judging the reliability of evidence, "[t]he Government bears the ultimate burden of persuasion." *Al-Bihani v. Obama,* 590 F.3d 866, 880 (D.C. Cir. 2010). Meaningful review in the habeas context requires that a court have "some authority to assess the sufficiency of the Government's evidence against the detainee." *Id.* at 875.

Confessions given to reduce the abuse meted out by interrogators have been found unreliable in the Guantánamo context.  *See Anam v. Obama*, 696 F. Supp. 2d 1, 7 (D.D.C. 2010) (petitioner's statement was unreliable because it was made under coercion and petitioner faced threats of abuse if he retracted it); *Al Rabiah v. United States*, 658 F. Supp. 2d 11, 36 (D.D.C. 2009) (evidence suggested no "clean break" between coercion and petitioner's later statements and court therefore could not find by preponderance of evidence that confessions were reliable and credible).  "As a practical matter, resort to coercive tactics by an interrogator renders the information less likely to be true."  *Mohammed v. Obama,* 704 F. Supp. 2d 1, 24-25 (D.D.C.

2009) (citing *Linkletter v. Walker*, 381 U.S. 618, 638 (1965)).  The court also declined to rely on statements by two detainees made shortly after being subjected to abusive conditions.  *Abdah v. Obama,* 708 F. Supp. 2d 9, 14 (D.D.C. 2010).

In the criminal context, *Brown v. Mississippi* examined whether convictions which rest solely upon confessions extorted by brutality and violence are consistent with the due process of law.  297 U.S. 278, 279 (1936).  The Supreme Court found that a "trial … is a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence."  *Id.* at 286.  When the Supreme Court recognized this Court's jurisdiction to hear Guantánamo habeas cases, it surely did not intend for these hearings to be mere pretenses, either.

In these Guantánamo cases, courts in this district have looked to rules from the criminal context regarding the reliability of coerced statements to determine whether a statement was unreliably extracted through coercion or torture.  *See al-Qurashi,* 733 F. Supp. 2d at 79 (holding that test for determining whether statements from petitioner are reliable would be based on "the test of voluntariness" from criminal law).  The Supreme Court has identified several factors to determine whether a coerced statement is voluntary.  *Oregon v. Elstad,* 470 U.S. 298, 310 (1985); *see also United States v. Karake,* 443 F. Supp. 2d 8, 87 (D.D.C. 2006).

Throughout his imprisonment, Mr. Aamer has been subjected to brutal treatment at the hands of agents acting for the U.S. government or at its sufferance.  This has included the general conditions of his imprisonment, mistreatment by guards, and specific instances of abuse during interrogations.  There is no reason for this Court to believe that this case will be any different from the many other Guantánamo cases that have preceded it and that Respondents here will *not* seek to introduce into evidence statements Mr. Aamer has reportedly made.  Such statements were likely obtained under coercion.  An independent medical expert will shed necessary light

on those circumstances and their impact, if any, on the statements' reliability.  By gathering information about the physical and mental health of Mr. Aamer, an independent medical expert would be able to determine if he displays signs and symptoms consistent with those exhibited by a survivor of torture, cruel treatment, or coercion.  This information bears on the Court's assessment of the reliability of any statements Mr. Aamer reportedly made and would allow the Court to properly evaluate any reported statements Respondents may introduce.  Compelling access to a medical expert is therefore necessary and appropriate to aid the Court's constitutional jurisdiction over Mr. Aamer's case.  Indeed, for Mr. Aamer to have the "meaningful opportunity" that *Boumediene* requires, 553 U.S. at 779, the Court must assess the reliability of all evidence.

**B.  Access to an independent medical expert is necessary to determine if Mr. Aamer can meaningfully participate in his habeas proceedings.**

Respondents' mistreatment of Mr. Aamer goes beyond raising doubts as to the reliability of Respondents' evidence.  Respondents' actions have compromised Mr. Aamer's health to the point where his ability to participate in his habeas proceeding is questionable.  In addition to the Court's duty to assess the reliability of evidence presented, the Court also has a duty to preserve its jurisdiction from being compromised or permanently lost.  This was true even before *Boumediene* firmly established the jurisdiction of U.S. courts over these Guantánamo cases and it is equally true now.  *Belbacha*, 520 F.3d at 457.

An independent medical expert's opinion would inform the Court and undersigned counsel as to whether or not Mr. Aamer can meaningfully participate in his proceedings.  That determination bears directly on the Court's ability to fulfill its obligation to conduct a "meaningful review" of Mr. Aamer's habeas corpus petition, as required by the Supreme Court. *Boumediene*, 553 U.S. at 783.  The court in *Al-Joudi* noted that "access to counsel by Petitioners

14

is illusory unless counsel has sufficient access to their clients to be informed about their physical condition." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 22 (D.D.C. 2005).  While *Al-Joudi* dealt only with access to medical records, the principle that, for counsel to be effective, they must be informed of the client's medical condition holds true and is applicable in this case.  *Id.*  In the absence of information allowing this Court and undersigned counsel to assess reliably the state of Mr. Aamer's health, it will be arduous, if not impossible, to ascertain whether or not he has been (or could be) deprived of his constitutionally-guaranteed opportunity to participate meaningfully in his proceedings.

Further, without such information, undersigned counsel would be unable to request—and the Court would be unable to order—measures that may be necessary to preserve Mr. Aamer's ability to participate in his case.  That, in turn, would jeopardize the Court's jurisdiction over this case.  *See, e.g., Al-Oshan v. Obama*, 753 F. Supp. 2d 1, 2 (D.D.C. 2010) (independent medical expert allowed to protect court's jurisdiction when client's medical condition adversely affected ability to work with counsel); *Zuhair v. Bush*, 592 F. Supp. 2d 16, 17 (D.D.C. 2008) (independent medical expert allowed to protect jurisdiction when prisoner was showing signs of deteriorating health that interfered with ability to meet with counsel).  *See also In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8, 15 (D.D.C. 2012) (holding that access to courts is inseparable from access to counsel in habeas context).

Both *Zuhair* and *Al-Oshan* dealt with Guantánamo detainees who were participating in hunger strikes.  *Al-Oshan*, 753 F. Supp. 2d at 1; Pet'r's Mot. to Compel Production of Medical Records and for Order Permitting Independent Medical Examination at 2, *Zuhair v. Bush*, 592 F. Supp. 2d 16 (D.D.C. 2008) (No. 08-0864) [hereinafter Motion to Compel *Zuhair*].  Both petitioners had lost significant weight.  *Al-Oshan*, 753 F. Supp. 2d at 6 (petitioner was 71% of

ideal body weight and court noted expert testimony establishing that at 70% ideal body weight the body begins to "cannibalize its own muscle tissue" leading to "abdominal pain, weakness, dizziness, and emotional withdrawal"); *Zuhair*, 592 F. Supp. 2d at 17 (petitioner was less than 80% of ideal body weight and dropped from 147 pounds to 111 pounds in one month).

The courts in both *Zuhair* and *Al-Oshan* compelled access to medical experts to evaluate the petitioners at Guantánamo. *Al-Oshan*, 753 F. Supp. 2d at 2; *Zuhair*, 592 F. Supp. 2d at 17. The petitioners in *Al-Oshan* and *Zuhair* additionally did not trust the medical staff at Guantánamo. *Al-Oshan*, 753 F. Supp. 2d at 3; Motion to Compel *Zuhair* at 11. Moreover, the petitioner in *Al-Oshan* showed signs of mental stress. *Al-Oshan*, 753 F. Supp. 2d at 4. In both cases, the petitioners' physical and mental conditions were adversely affecting their ability to participate in their cases. *Al-Oshan*, 753 F. Supp. 2d at 5 (petitioner fatigued through meetings with counsel due to weight loss, can only participate for short while, and missed meetings due to health emergencies); *Zuhair*, 592 F. Supp. 2d at 17 (petitioner vomited through most of recent meeting with counsel).

Like the petitioners in *Zuhair* and *Al-Oshan*, Mr. Aamer is participating in a hunger strike and has lost a significant amount of weight as a result, Stafford-Smith Decl. Ex. C, at ¶ 24. Mr. Aamer has lost approximately 60 pounds from his previous weight of 208 pounds since starting his most recent hunger strike at the beginning of February. Kassem Decl. Ex. C, at ¶ 26. While Respondents have provided some of Mr. Aamer's medical history to his counsel, their repeated failures to address Mr. Aamer's medical needs, to respond humanely to his hunger strike, and, generally, to improve his condition cast doubt on the accuracy of their medical reports. Further, Mr. Aamer faces retaliation for his hunger strike. Stafford-Smith Decl. Ex. C, at ¶¶ 24, 26. He is brutalized by an IRF team any time he wishes to receive his medication. *Id.* at ¶ 31. He is

subjected to new IRF procedures that exacerbate past injuries and, following his complaints to medical staff, these new procedures not only continued, but worsened. *Id.* at ¶ 28. Like the petitioners in *Zuhair* and *Al-Oshan*, Mr. Aamer's treatment while confined at Guantánamo has adversely affected his ability to participate in his proceedings. *See* Kassem Decl. Ex. C, at ¶ 4. Only with an examination by an independent medical expert may the Court and Mr. Aamer's counsel form an accurate perspective on his health and, by extension, his ability to participate meaningfully in these proceedings, in accordance with *Boumediene*.

## II.   PETITIONER IS ENTITLED TO INJUNCTIVE RELIEF COMPELLING ACCESS TO AN INDEPENDENT MEDICAL EXPERT

Respondents' mistreatment of Mr. Aamer not only threatens the Court's jurisdiction and calls into question the reliability of any statements that Mr. Aamer reportedly made, but it also threatens his very health and well-being. The threat of irreparable injury entitles Mr. Aamer to relief under Federal Rule of Civil Procedure 65. An expert could gather evidence that would allow Mr. Aamer's counsel to reliably monitor his health and ability to participate in his case on an ongoing basis.

In considering a petitioner's request for a preliminary injunction, courts look to whether or not: (1) the petitioner would suffer irreparable harm absent the preliminary injunction; (2) the petitioner has a substantial likelihood of success on the merits; (3) the injunction would substantially injure the opposing party; and (4) the public interest would be furthered by issuance of the injunction. *See Serono Labs v. Shalala*, 158 F. 3d 1313, 1317-18 (D.C. Cir. 1998) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842 (D.C. Cir. 1977)). "These factors interrelate on a sliding scale and must be balanced against each other." *Id.* at 1318. "If the arguments for one factor are particularly strong, an injunction may issue even

if the arguments in other areas are rather weak." *Id*.  All four of these factors weigh in Mr. Aamer's favor.

> **A. The government's mistreatment of Mr. Aamer threatens irreparable harm.**

Mr. Aamer's consistent abuse at Respondents' hands has left him physically and mentally vulnerable, and at great risk of suffering irreparable injury.  This court has recognized the inherently vulnerable position of detainees at Guantánamo, remarking that the "circumstances of their confinement render their ability to investigate nonexistent." *In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 15.  In *Al-Joudi*, the court also recognized that the prisoners are "indeed vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantánamo and weakened physical condition." 406 F. Supp. 2d at 20.  Additionally, the court found that "where the health of a … vulnerable person is at stake, irreparable harm can be established." *Id*.

Mr. Aamer is in a vulnerable position and his health is at stake.  As stated above, Mr. Aamer has lost significant weight over the course of his imprisonment and during his ongoing hunger strike.  He is routinely assaulted physically by guards, sustaining repeated injury in the process.  Merely asking for medical care during his hunger strike suffices to trigger these acts of violence.  He fears paralysis or death—in other words, irreparable injury—during these assaults. Mr. Aamer has also been kept in solitary confinement for prolonged periods of time and only allowed out of his cell for two hours per day.  He suffers from numerous ailments that have gone untreated and have, in fact, been made worse by the conditions of his imprisonment.  Also, he has been held in deplorably unhygienic conditions, which have resulted in further health complications.  The sum of these conditions, exacerbated by his indefinite confinement after being cleared for release years ago, has taken a great psychological toll on Mr. Aamer, as well.

A medical expert would inform the Court and undersigned counsel of Mr. Aamer's exact condition and needs. This information would be invaluable in preventing Mr. Aamer's further deterioration at Respondents' hands.

### B. Mr. Aamer is substantially likely to prevail on the merits.

Mr. Aamer is likely to prevail on the merits of his claim because it is rooted in the right of all Guantánamo prisoners to have their habeas petitions heard in federal court with the aid of counsel. *See Boumediene*, 553 U.S. at 729 (citing lack of counsel as one of the reasons that Combatant Status Review Tribunals were deficient as substitute for habeas corpus); *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143, 156 (D.D.C. 2008) (defining "counsel" to include "all other personnel or support staff employed or engaged to assist in the litigation" on a detainee's behalf) [hereinafter "Protective Order"]. *See also In re Guantánamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8, 14 (D.D.C. Sept. 6, 2012) (preserving access to counsel subject to Protective Order, even after habeas petitions dismissed or denied, and notwithstanding government objections, in order to protect "a detainee's access to counsel, and thus the detainee's constitutional right to access the courts").

Moreover, courts have noted that seeking an independent medical evaluation "fall[s] into a category of relief over which the court[s] [have] jurisdiction." *Tumani v. Obama*, 598 F. Supp. 2d 67, 70 (2009). *See also Al-Oshan*, 753 F. Supp. 2d at 6 (holding that although courts do not have jurisdiction over conditions of confinement, they have jurisdiction to compel access for medical expert as that deals with detainee health). As the Supreme Court held, jurisdiction to hear habeas claims from Guantánamo does not merely entail "hearing" the case, but requires courts to "conduct a meaningful review." *Boumediene*, 553 U.S. at 783. Courts must fashion procedures to ensure habeas petitioners can meaningfully present their cases before the courts. *Al Odah*, 346 F. Supp. 2d at 11; *Al-Joudi*, 406 F. Supp. 2d at 21.

Allowing an independent medical examination of Mr. Aamer would aid in the exercise of the Court's jurisdiction by giving his counsel and the Court an accurate sense of his ability to continue to participate in these proceedings and of the risk that he may lose that ability in the future.  The *Al-Joudi* court recognized that "access to counsel by Petitioners is illusory unless counsel has sufficient access to their clients to be informed about their physical condition."  *Al-Joudi*, 406 F. Supp. 2d at 22.  Although the court held that medical reports were sufficient in *Al-Joudi*, reports alone are inadequate in this case because of the serious doubts that both Mr. Aamer and his counsel have as to the reliability of reports compiled by Guantánamo medical staff members who have themselves contributed to Mr. Aamer's mistreatment.

Mr. Aamer has several reasons for not trusting the doctors on staff at Guantánamo.  He is often given only redacted reports explaining the doctors' treatment and opinions on his health. When he is given treatment by those doctors, he often sees that treatment manipulated or taken away after a short time as punishment. Aamer Decl. Ex. A, at ¶ 49.  He has witnessed the medical staff's complicity in his abuse and heard them dismiss the damage done him by Guantánamo guards.  Stafford-Smith Decl. Ex. B, at ¶ 52.  Whatever reports they produce do not accurately and fully reflect the abuse by Guantánamo personnel that Mr. Aamer reports and its severe effect on his well-being.  *Id.* at ¶ 50.   Since his recent hunger strike began, the medical staff has continued to be, at best, ineffective rubber stamps to his abuse, and at worst, active participants.  *Id.*  The lack of trust in Guantánamo doctors has been an issue in past cases where an independent medical expert was allowed.  *See, e.g., Al-Oshan*, 753 F. Supp. 2d at 3.  Our statutes, too, recognize that access to counsel does not end at lawyers but also includes non-lawyer experts as necessary to present the best case possible.  *See* 18 U.S.C. § 3006A(e)(1) (2013) (providing funding for expert witnesses for indigent defendants).

## C.  An injunction would not substantially injure the government.

It is unlikely that Respondents would be unduly burdened if an independent medical expert were allowed to examine Mr. Aamer.  Access to independent medical experts has, after all, been ordered without prohibitively burdening Guantánamo authorities or prison staff and there is no reason this case should be any different.  *See, e.g., Al-Oshan*, 753 F. Supp. 2d at 2; *Zuhair*, 592 F. Supp. 2d at 17.  As the court in *Al-Joudi* noted in connection with medical records, the logistical burden is "simply not substantial when weighed against the irreparable injury Petitioners face."  *Al-Joudi*, 406 F. Supp. 2d at 22.

In addition to medical experts, Guantánamo is regularly visited by all manner of individuals, including press, attorneys, interpreters, and other professionals.  Thus, an independent medical expert to assess Mr. Aamer's condition seems unlikely to add great burden to Respondents.  Civilian lawyers have long been granted access even to some of the most sensitive areas of Guantánamo.  *See, e.g.*, *Judge Grants Access To Secret Guantanamo Camp*, ASSOCIATED PRESS WORLDSTREAM (Feb. 21, 2013); Peter Finn, *Defense Lawyers Get Access To Secret Guantánamo Camp*, WASHINGTON POST (Oct. 28, 2008)[4]. Although their access is more limited, the press is able to visit Guantánamo.  *See, e.g. The Media And The Military: Guantánamo Access Rules Loosened Other Guidelines Set to Limit Leaks* (Jan. 6, 2011)[5]. Humanitarian organizations such as the International Committee for the Red Cross are also given access to Guantánamo.  *See, e.g.* Bradley S. Klapper, *Red Cross Expects to Meet with Top Terror Suspects During Guantanamo Visit*, ASSOCIATED PRESS WORLDSTREAM (Sept. 20, 2006).

---

[4] *Available at* http://articles.washingtonpost.com/2008-10-28/news/36930111_1_guantanamo-bay-military-judge-suzanne-lachelier.
[5] *Available at* http://blog.lib.umn.edu/cla/discoveries/2011/01/the-media-and-the-military-gua.html.

**D.  An injunction would further the public interest.**

Courts have found that "the public interest will be served by ensuring that habeas petitioners have access to counsel so that they can meaningfully challenge their detention, and the courts can adjudicate their claims."  *Al-Joudi*, 406 F. Supp. 2d at 22-23.   An independent medical expert would serve as an extension of counsel in this case.   Moreover, providing access to an independent medical expert would promote fairness by helping to ensure that any evidence the government uses in these proceedings is reliable.   Additionally, a sound assessment of Mr. Aamer's readiness to participate in this proceeding will guarantee the Court's continued ability to adjudicate the case.

Hence, to prevent further irreparable injury to Mr. Aamer and to ensure that he is and will remain able to participate in his habeas proceedings, this Court should order the injunctive relief sought herein.

## CONCLUSION

For the reasons stated above, the Court should grant the relief sought in this Motion and immediately compel Respondents to permit Petitioner Shaker Aamer to be examined by a medical expert of Petitioner's choice, retained by undersigned counsel.


Dated:  October 1, 2013


Respectfully submitted,

____/s/_____

Ramzi Kassem
*Supervising Attorney*
Golnaz Fakhimi
*Staff Attorney*
Marlowe Boettcher
Elisabeth Rossow
*Law Student Interns*
**Main Street Legal Services, Inc.**
City University of New York School of Law
2 Court Square
Long Island City, NY 11101
(718) 340-4558

David H. Remes
**Appeal for Justice**
1106 Noyes Drive
Silver Spring, MD 20910
(202) 669-6508

Clive Stafford Smith
**Reprieve**
P.O. Box 52742
London, EC4P 4WS
Tel: +44(0)20 7353 4640

*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHAKER AAMER,

     *Petitioner,*

     v.                                **Case No. 04-CV-2215 (RMC)**

BARACK H. OBAMA, *et al.,*

     *Respondents.*

## [PROPOSED] ORDER  TO PERMIT AN INDEPENDENT MEDICAL EXAMINATION

     **IT IS HEREBY ORDERED THAT** Respondents shall permit a physical and psychological examination of Petitioner to be conducted by a medical expert of Petitioner's choice, retained by Petitioner's counsel.

Date: _____

                               _____
                               ROSEMARY M. COLLYER
                               United States District Judge